HENRY CLARK, alias KID FRITZ, *Plaintiff in Error*, v. THE STATE OF FLORIDA, *Defendant in Error*.

In a criminal case where a defendant is charged with an assault with intent to commit rape, it is the adjudged rule, where

intent alone is charged, that if there be any reasonable hypothesis upon which the circumstances are consistent with the prisoner's innocence, such hypothesis should control the verdict of the jury. The criminal intent must be proven by some act or deed evidencing the intent, and the facts must not only be consistent with the guilt, but inconsistent with the innocence of the accused. The *intent* in such cases must be shown by the evidence to have so possessed the accused that his determination was to consummate the rape regardless of resistance and want of consent. Proof of mere solicitation for sexual intercourse is in such a case insufficient to sustain a verdict of guilty.

This case was decided by Division B.

Writ of Error to the Circuit Court for Walton County.

The facts in the case are stated in the opinion of the court.

*W. T. Bludworth* and *D. A. Simmons,* for plaintiff in error;

No appearance for the State.

Hocker, J.—On the 12th of May, 1908, the plaintiff in error was indicted in the Circuit Court of Walton County for the alleged offense of assault with intent to commit rape upon one R. E. Faircloth, a female above the age of ten years. The offense is charged in apt language and is based on sections 3220 and 3221 of the General Statutes of 1906. On a trial he was convicted and sentenced to a term of three years in the State Prison. On writ of error here, the only question presented is the sufficiency of the evidence to sustain the verdict.

The whole evidence contained in the record is as follows:

"I am R. E. Faircloth, I saw this negro, the defendant before, I was living at the Lewis place across the Bayou from McCaskell's mill, and he was there, and he grabbed me and started out at the front door, it was about dark, there was nobody there but the children. My husband was not there that I know of. I first saw him at the pump. It was late in the evening. There was a back gallery and a hall through the house, and a gallery all around the house, one hall was across the house and the other came lengthwise and met it. I was in the hall and the bed room was on one side of the hall and the kitchen room was on the other side of the hall. I started in the kitchen. I was going after water—the pump where I saw him was on the back gallery (here the witness was handed crude map and asked if this was the position of the house and if the marked locations were the ones, and after testifying that they were, the map was introduced in evidence and is hereto attached and made part of this testimony, marked exhibit 'A'). I saw him when he grabbed me by my right hand and put his hand on my breast, and said he wanted a negro boy. I hollowed, I told him to turn me loose, he turned me aloose when I screamed and he ran. I did nothing else. John, my husband, was there at the door as soon as I hollowed, and my husband got his gun and started to kill the negro but he got in a boat, the negro did and went across the bayou. It was in this county and State. I had started in the room to see about the baby when the negro grabbed me in the hall. I have three children. This was on April fifth, 1908.

## CROSS.

It was across the bayou to nearest house. I lived in

the Lewis House. There were several colored families on the same side of the bayou. My husband was out in the lot when the negro grabbed me. The lot was about as far from the house as the length of this Court House. Negroes were continually there, we ran a truck farm. I do not know what the defendant said he wanted. It was dark. There was a light in the house. Not good dark out of doors. He started to pulling me right off. As soon as I screamed he turned loose. I have not been keeping a bad house down there. My husband was not gone long after the defendant. The defendant did not hurt me anyway. He did not make any threats. I saw no weapons. I saw nobody but him. There was another negro there afterwards. Negroes were continually there. We were running a truck farm. I saw nothing when I first saw him.

### REDIRECT.

Far as I know I never saw the defendant before then. Mr. Armstrong was there on the gallery at the side of the house. He staid there and roomed there and boarded there.

### RECROSS.

I am sure this is he. My husband was out at the lot about the length of this Court House from where the defendant was.

And thereupon to further maintain the issues on its behalf the State produced to be sworn as a witness one Henry Tanton, who testified as follows: I have seen the defendant. Henry Clark is his name. I know him by the name of Kid Fritz. I arrested him. He had a conversation with me on the train and said he wanted to pay it up and stop it, and said that he went over there that day to buy some whiskey. He said he never hurt the woman.

CROSS.

He said it was Sunday evening. He said he went there to buy whiskey. He were talking about the case.

And thereupon to further maintain the issue on its behalf the State produced to be sworn John Faircloth, who after being duly sworn testified as follows: I am husband of R. E. Faircloth. I know very little about the case. I was out in the lot feeding and I went after him when I heard my wife hollow.

Thereupon the State rested its case.

And the defendant to maintain the issue on its behalf produced and caused to be sworn as a witness one Charles D. Campbell, who after being duly sworn testified as follows: I was with the defendant on April the fifth 1908 from about two o'clock in the afternoon till about ten o'clock that night, and Ishmal Harris was with him at the same time, and we went to the Lewis house where Mr. Faircloth lived. When we first met up with Kid Fritz he had been drinking a little, and he said if we would follow him we would get some more whiskey, and we went with him to Mr. Faircloth's house, and I saw the defendant all the time while we were there. The defendant went in and laid his hand upon the wall, but did not put his hand upon Mrs. Faircloth. I saw him all the time we were there and I know that he did not put his hands upon her or bother her. We were out a little distance from the house and it was late in the evening, but I could see the defendant.

And thereupon to further maintain his issue produced and caused to be sworn as a witness one Ishmal Harris, who after being duly sworn testified as follows: My name is Ishamal Harris. I was with the defendant on April fifth of this year from about two o'clock in the

afternoon till about ten o'clock that night and Charles D. Campbell was with us all the time. Kid Fritz told us that if we would follow him he would get some whiskey, and we followed him and he went to Mr. Faircloth's and I saw him all the time he was there. He went in and laid his hand on the wall. He did not put his hand on Mrs. Faircloth nor bother her. That was all the time we went there.

### CROSS.

It was about night. I was out a little distance from the house.

And thereupon to further maintain his issue the defendant, Henry Clark, after being duly sworn testified as follows: I went to the Lewis place, me and the two witnesses who have just testified in this case. I did not take hold of Mrs. Faircloth, nor threaten her, nor have any weapon. I did not use any improper language to her that evening. I did not put my hands upon her. I did not try to bother her in any way. I went there to buy some whiskey, and I bought it. I bought a pint. I was running on the 'Fritz.' I went back to the boat and went off on the 'Fritz' next morning to Pensacola. I was working on the 'Fritz.'

### CROSS.

When I first met these two other negroes I was not drinking much. They were about seventy-five yards from the house. I did not see the baby. I did not tell Mr. Tanton that he swore to. I did not hear Mrs. Faircloth scream at all. I had no intention to bother Mrs. Faircloth while I was there or at any other time.

Thereupon the defendant rested his case.

Thereupon the State to further prove its issue re-

called Mrs. Faircloth to rebut the statements made by defendant.

Fritz did not try to buy any whiskey from me. He did not get any whiskey from me.

### CROSS.

Old man Armstrong and my husband had been drinking."

In the case of Harbert Davis v. State, 22 Fla. 633, the plaintiff in error was convicted of the charge of assault with intent to commit the crime of rape. The verdict was challenged as unsupported by the evidence. The court on page 636 of the opinion states the law as follows: "It is the admitted rule in such cases, where intent is alone charged, that if there 'be any reasonable hypothesis upon which the circumstances are consistent with the prisoner's innocence,' such hypothesis should control the verdict of the jury. The criminal intent must be proved by some act or deed evidencing it. In Rex. vs. Lloyd, 7 Car. & Payne, 318, it was held by Patterson, J., that 'in order to find the prisoner guilty of an assault with intent to commit a rape, you must be satisfied that the prisoner, when he laid hold of the prosecutrix, not only desired to gratify his passions upon her person, but that he intended to do so at all events, and notwithstanding any resistance on her part. It is not proof of guilt, merely, that the facts are consistent with guilt, but they must be inconsistent with innocence. It is neither charity nor common sense, nor law, to *infer* the worst intent which the facts will admit of.' "

In the case of Hunter v. State, 29 Fla. 486, 10 South. Rep. 730, this court held in a similar case: "The intent in such cases must be shown by the State to have so possessed the accused that his determination was to consum-

mate the rape regardless of resistance and want of consent."

The facts in the instant case, however outrageous to the sensibilities of a virtuous woman, come far short of the requirements of the law laid down in these cases as being necessary to constitute the offense of assault with intent to commit rape. Whatever may have been the purpose of the defendant in going into the house where she was, and grabbing her and starting out of the front door, he turned her loose when she told him to do so, and when she screamed he ran. Mrs. Faircloth says that when the accused grabbed her he said "he wanted a negro boy." On cross examination she testified she did not know what the defendant said he wanted; that it was not good dark out of doors; that there was a light in the house; that the accused did not hurt her in any way, and that when she screamed he turned her loose. She also testified that her husband was out in the lot, about the length of the Court House from where the defendant was, and that a Mr. Armstrong was on the gallery. She also testified that negroes were continually around, that they ran a truck farm, and that her husband and Mr. Armstrong were drinking.

The accused testified that he went with two other men to the Faircloth house to get some whiskey. These men testified to the same effect, and all denied that any assault was made on Mrs. Faircloth. These facts and the surroundings do not, in our opinion, support the theory that the accused intended to consummate a rape regardless of resistance and want of consent on the part of the prosecutrix.

The judgment is reversed and the case remanded.

TAYLOR and PARKHILL, JJ., concur;

SHACKLEFORD, C. J., and COCKRELL and WHITFIELD, JJ., concur in the opinion.