Dannelly v. State of Florida—Syllabus.

———————

A. W. DANNELLY, *Plaintiff in Error*, v. THE STATE OF FLORIDA, *Defendant in Error*.

Opinion Filed December 2, 1920.

CRIMINAL LAW—ASSAULT WITH INTENT TO COMMIT RAPE—GRAVAMEN OF THE CRIME IS THE INTENT WITH WHICH THE ASSAULT IS MADE—VOLUNTARY DESISTENCE FROM THE ASSAULT BEFORE CONSUMMATION, WITHOUT OUTSIDE INTERFERENCE AND WITH NO UNUSUAL RESISTANCE ON THE FEMALE'S PART PREVENTS CONVICTION.

1. The gravamen of the crime of assault with intent to commit rape is the *intent* with which the assault is made. The *intent* in such cases must be shown by the State to have so

possessed the accused that his determination was to consummate the rape, regardless of resistance and want of consent.

2.  A conviction of the crime of assault with intent to rape will not be sustained upon proof that the assailant voluntarily desisted before consummation, without any outside interference; and with no unusual resistance on the female's part.

3.  Where the testimony shows that a series of indecent assaults were made, but not with the necessary intent to commit rape by force and without the female's consent, but rather with the intent to induce her consent, and on being convinced that he cannot obtain such consent the defendant voluntarily desists from his attempts without any outside interference, and without any unusual resistance on the female's part, there can be no legal conviction.

A writ of error to the Circuit Court for Walton County.

Judgment reversed.

*Walter Kehoe* and *Forsyth Caro,* for Plaintiff in Error;

*Van C. Swearingen,* Attorney General, and *D. Stuart Gillis,* Assistant, for the State.

TAYLOR, J.—The plaintiff in error, hereinafter referred to as the defendant, was convicted and sentenced to imprisonment for two years in State's prison in the Circuit Court of Walton County for the crime of assault with intent to rape, and by writ of error brings such judgment here for review.

From the conclusion which we have reached upon consideration of the record in the case it becomes unnecessary to pass upon any of the errors assigned, except that

of the denial of the defendant's motion for new trial, made upon the ground that the verdict of conviction is not warranted by the evidence in the case. The chief and only eye-witness of the occurrence of the State was Stella Bishop, the prosecutrix. The substance of her testimony was as follows: That she was eighteen years of age; that her father was dead, and that she lived with her mother; that she had known the defendant for a year; that he, the defendant, came to her house about three o'clock in the afternoon in a car, about the 21st of April, 1920, on Wednesday. Mrs. Adkinson was with him. That Mrs. Adkinson resided close to and in sight of her residence. They got out of the car and came in to our house. Mrs. Adkinson called to us and said: "Come let us go and look at the new road." In a few minutes I came down from upstairs, the defendant said: "Come, Stella, let's go look at the new road, dont go to fixing up, I am in a hurry; there ain't nobody going but me and you Stella, the widows can stay here." This was said while I was in the house. Then he and I went out and got in the car and started off in the direction of the Boggy road, just me and Mr. Dannelley. We both sat on the front seat. About the time we left he hugged and kissed me. We were about half a mile from the house. He hugged and kissed me and felt my breast and pulled up my dress. I told him if he was going to do that way to stop the car and I would go back. He laughed at me and asked if I had not heard of Wash Dannelley before. He went on down the road and kept trying to kiss me, and I told him to stop the car. I was doing everything I could to keep him from it. After we got down the road a piece he turned out and went into the woods. When we were coming back we saw some people at Mr. Gaskins' camp. When we saw them he told me to straighten up that right eye and look pert. I had

been crying because of what he had done. He drove faster as he passed these people. I asked him to let me out of the car there, but he would not do it. When we got off the road about a hundred yards where nobody could see me he stopped the car. He drove over stumps, trees and logs. I thought he would turn the car over. He stopped the car and said he was G-d' damn sure going to have it. If I wouldn't give it to him he would rape me. He got up from where he was sitting and got down over me and said he was going to have it anyway. He told me I was the G-d d-mst girl he ever saw—couldn't stand for his hands to be laid on me. I was doing everything I could to keep him off of me. I was fighting him and kicking him. He got pretty close to me. He told me to be d-mnd sure I didn't wear any pants the next time I went riding with him. He pulled up my dress and put his hand on my throat. He had his other hand on his pants like he was going to unbutton them. He pulled up my dress and put one hand under my dress and told me he was G-d d-md sure going to do it to me. He put his legs up against mine, his knees, and pushed mine apart. I was trying to fight and to kick him. He tried to unbutton my clothes, but didn't unbutton them. I did not know whether I used my mouth or not. I told him to stop and hallooed out three or four times. He told me to hush. I tried to tighten my legs. I tried to kick him. I kicked him all I could only he was holding me down. I did not get out of the car there. He wouldn't let me. He did not have intercourse with me. I didn't give any consent to have intercourse with me. All of these actions were against my will. I didn't give him consent to these actions or doings of Mr. Dannelley. I didn't want him to do it. When we left there we came back the way we had come and went over the new road. He stopped several times on the way

and hugged me and kissed me.  We came by an old house and he said: "You are going in that old house with me." I told him I was not; then he said there is a G-d d-mn shade hanging in that window and I believe somebody lives there.  Before he saw the shade he said he was going to do it to me after he got me in there.  I told him he wouldn't as long as I could help myself.  When I was down in the woods before we started back I hallooed and kicked to prevent him from having intercourse with me, and I was crying.  It was about a quarter of a mile to the nearest house, Mr. Umbrose.  I couldn't see the house from the road for the bushes and trees.  This was in Walton County, Florida, about three o'clock in the afternoon, Wednesday, the 21st day of April, 1920.  We then went back to Mrs. Adkinson's.  I got out there that evening, went in and got a drink of water and I said I was going home, and went home.  Mr. Dannelley had gone on.  Two days later I saw Mr. Dannelley.  He came down to Mrs. Adkinson's, where I was.  He came in and spoke to me. I was sitting in the swing.  He sat down in the rocker and pulled his chair close up to me trying to talk to me. He said he had brought a message to me and did I want to hear it.  I said, "I don't care to."  He got up and went into the house and I went in with him.  He told me he knew he had done wrong and he was sorry for it.  I told him he was liable to be sorrier of it later if he did not mind out.

Cross-examined, she said in substance: He was in sight of our house when he first started to hug and kiss me, probably half a mile.  He stopped the car two or three times and put his hands under my clothes, and said he was going to do it to me.  Just stopped the car a few minutes.  He done this two or three times.  He kept on hugging me and kissing me and putting his hands under my

dress. We were about two miles from home on the Boggy road when he turned off and went into the bushes near a branch. When he got down there he said he was going to do it to me. I was still in the car, never got out. He had one of his hands on my breast, and the other hand on himself like he was going to unbutton his pants. After he got through down there he put one hand under my dress and pulled it up. I had on my underskirt and drawers. My drawers were buttoned up. He did not unbutton them, nor did he try to unbutton them, nor did he break the buttons off. My drawers never came off, nor were unbuttoned and he did not have sexual intercourse with me. The only thing I did was to kick and push him. I don't know how long after he quit trying to have intercourse with me before we started the car up again. He begged me to do it as we drove off. We came back the same road we went. From then on he didn't try to do anything, but kept on trying to hug and kiss me.

In several cases this court has held that the gravamen of the crime of assault with intent to commit rape is the *intent* with which the assault is made; and that the intent in such cases must be shown by the State to have so possessed the accused that his determination was to consummate the rape regardless of resistance and want of consent. Hunter v. State, 29 Fla. 486, 10 South. Rep. 730; Clark v. State, 56 Fla. 46, 47 South. Rep. 481; Bell v. State, 61 Fla. 6, 54 South. Rep. 799. And in the case of Rushton v. State, 58 Fla. 94, 50 South. Rep. 486, we have held that "a conviction of assault with intent to rape will not be sustained upon proof that the assailant voluntarily desisted before consummation, without suggestion of outside interference and with no unusual resistance on the woman's part. The testimony of the prosecutrix in this case shows that a highly indecent series of assaults were

made by the defendant upon her, but it does not make out the necessary *intent* on the assailant's part to sustain the conviction had. It tends rather to show that his intent was to obtain her consent to his intercourse, and that when he became convinced that he could not obtain such consent he voluntarily desisted without any outside interference, and without unusual resistance upon her part. From this conclusion it follows that the court below erred in the denial of the defendant's motion for new trial on the ground that the verdict was not warranted by the evidence.

The judgment of the Circuit Court in the case is hereby reversed at the cost of Walton County.

BROWNE, C. J., AND WHITFIELD, J., concur.

ELLIS AND WEST, J. J., dissent.